## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| STEVEN KITTLE, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>AMERICA'S TEST KITCHEN LP, a Massachusetts limited partnership,<br><br>Defendant. | Case No. 19-cv-11757<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Steven Kittle ("Plaintiff"), individually and on behalf of himself and all others similarly situated, by and through his attorneys, makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to allegations specifically pertaining to himself and his counsel, which are based on personal knowledge.

### <u>INTRODUCTION</u>

1.      Between June 13, 2016 and July 30, 2016, Defendant America's Test Kitchen LP ("ATK") rented, exchanged, and/or otherwise disclosed personal information about Plaintiff Steven Kittle's *Cook's Illustrated* magazine subscription to data aggregators, data appenders, data cooperatives, and list brokers, among others, which in turn disclosed his information to aggressive

advertisers, political organizations, and non-profit companies. As a result, Mr. Kittle has received a barrage of unwanted junk mail. By renting, exchanging, and/or otherwise disclosing Mr. Kittle's Personal Reading Information (defined below) between June 13, 2016 and July 30, 2016, ATK violated Michigan's Preservation of Personal Privacy Act, H.B. 5331, 84th Leg. Reg. Sess., P.A. No. 378, §§ 1-4 (Mich. 1988), *id.* § 5, added by H.B. 4694, 85th Leg. Reg. Sess., P.A. No. 206, § 1 (Mich. 1989) (the "PPPA").[1]

2.      Documented evidence confirms these facts. For example, a list broker, Specialists Marketing Services, Inc., ("SMS") offers to provide renters access to the Personal Reading Information of 607, 910 active U.S. subscribers from the "Cook's Illustrated" mailing list at a base price of "$100/M [per thousand]," (i.e., 10 cents apiece).

---

[1] In May 2016, the Michigan legislature amended the PPPA. *See* S.B. 490, 98th Leg., Reg. Sess., P.A. No. 92 (Mich. 2016) (codified at M.C.L. § 445.1711, *et seq.*). The May 2016 amendment to the PPPA, which became effective on July 31, 2016, does not apply retroactively to claims that accrued prior to its July 31, 2016 effective date. *See Boelter v. Hearst Commc'ns, Inc.*, 192 F. Supp. 3d 427, 439-41 (S.D.N.Y. 2016) (holding that "the amendment to the [PP]PA does not apply to Plaintiffs' claims, and the Court will assess the sufficiency of those claims under the law as it was when Plaintiffs' claims accrued.") (citing *Landgraf v. USI Film Prods.*, 511 U.S. 224, 286 (1994)). Because the claims alleged herein accrued, and thus vested, prior to the July 31, 2016 effective date of the amended version of the PPPA, the pre-amendment version of the PPPA applies in this case. *See Horton v. GameStop, Corp.*, -- F. Supp. 3d --, 2018 WL 8335635, at *2-3 (W.D. Mich. Sept. 28, 2018).





**SEGMENTS:**

| | | | |
|---|---|---|---|
| 74,316 | 1 Month Subscribers | $10.00/M | $100.00/M |
| 200,725 | 3 Month Subscribers | $5.00/M | $100.00/M |
| 607,910 | Active Subscribers | | $100.00/M |
| 1,699,664 | Active Book Buyers | | $110.00/M |
| 1,598,081 | Total Expires | | $75.00/M |
| | Special Fundraiser Rate | | $75.00/M |
| | Competitive Mailer Rate | $25.00/M | $75.00/M |

**PROFILE:**

Cook's Illustrated, published bi-monthly by America's Test Kitchen, provides gourmet cooking enthusiasts with recipes, product reviews, and recommendations exhaustively researched in Cook's famous test kitchens. Advertising free, each issue brings it's readers illustrated directions on the best way to prepare recipes from pizza to plum pudding, results of blind food tastings, wine reviews and kitchen equipment tests.

This is a must test for all cooking, kitchenware, home furnishing, gardening, publishing, credit, fundraising and general merchandise offers!

3,000 name minimum applies on all reuse orders.

**SELECTIONS:**

| | |
|---|---|
| COA | $7.00/M |
| Enhancement | $15.00/M |
| Gender | $7.00/M |
| Paid | $7.00/M |
| Renewals | $7.00/M |
| Scf/State/Zip | $8.00/M |
| Zip + 4 | $5.00/M |

**ADDRESSING:**

| | |
|---|---|
| E-Mail | $55.00/F |
| FTP | $80.00/F |
| Key Coding | $1.50/M |



Counts Through:    04/30/2019
Next Update:    06/07/2019

**SOURCE:**
DMS/Online
100% Direct to Publisher

**GENDER:**
61% Female
26% Male

**DEMOGRAPHICS:**
Average Age - 45
Average Income - $75,000
88% College Educated
68% Own their Home

**UNIT OF SALE:**
$24.95

**MINIMUM ORDER:**         **UPDATES:**
8,000                                       Monthly

**NET NAME ARRANGEMENTS:**
Net 85%   R/C $8.00/M   Minimum 50,000

**TERMS AND CONDITIONS:**

Orders cancelled post merge or on/after mail date require payment in full. Orders cancelled before mail date will be subject to a $100/F cancellation fee, $15/M Running Charges and applicable selection charges i.e. enhanced selections and applicable shipping/media fees..

For detailed recommendations, please contact:
Mary Ann Montalbano x2204; maryamon@sms-inc.com

For counts, usage and orders, please contact:
Monica Drakeford x2119; moniodra@sms-inc.com



777 Terrace Avenue, Suite 401  Hasbrouck Heights  NJ 07604  201-865-5800  www.sms-inc.com

*See* Complaint Ex. B.

3

3.      Renters are also able to access the Personal Reading Information of 1,699,664 *Cook's Illustrated* "Active Book Buyers," at a base price of "$110/M." *Id.*

4.      ATK, through SMS, also offers access to the "America's Test Kitchen Masterfile," which is "comprised of subscribers and buyers from" a variety of ATK publications.

## America's Test Kitchen Masterfile



**SEGMENTS:**

| | | | |
|---|---|---|---|
| 1,807,097 | Total Universe | $10.00/M | $100.00/M |
| 109,587 | 1 Month Subscribers/Buyers | | $100.00/M |
| 321,246 | 3 Month Subscribers/Buyers | $5.00/M | $100.00/M |
| 1,803,097 | Active Subscribers/Buyers | | $100.00/M |
| 1,642,280 | Active Book Buyers | | $110.00/M |
| 2,194,825 | Total Expires | | $75.00/M |
| | Special Fundraiser Rate | | $75.00/M |
| | Competitive Mailer Rate | $25.00/M | $100.00/M |

**PROFILE:**

America's Test Kitchen Masterfile is comprised of subscribers and buyers from: Cook's Illustrated Magazine, Cook's Country Magazine, Cook's Illustrated and Cook's Country Book Buyers, and online subscribers to ATK, Cook's Illustrated and Cook's Country Online.

This is a must test for all cooking, kitchenware, home furnishing, gardening, publishing, credit, fundraising and general merchandise offers!

3,000 name minimum applies on all reuse orders.

**SELECTIONS:**

| | |
|---|---|
| COA | $7.00/M |
| Enhancement | $15.00/M |
| Gender | $7.00/M |
| Paid | $7.00/M |
| Renewals | $7.00/M |
| Scf/State/Zip | $8.00/M |
| Zip + 4 | $5.00/M |

**ADDRESSING:**

| | |
|---|---|
| E-mail | $55.00/F |
| FTP | $80.00/F |
| Key Coding | $1.50/M |

Counts Through:     04/30/2019
Next Update:     06/07/2019

**SOURCE:**
Direct Mail Sold/Online
100% Direct to Publisher

**GENDER:**
61% Female
26% Male

**DEMOGRAPHICS:**
Average Age - 45
Average Income - $75,000
88% College Educated
68% Own their Home

**UNIT OF SALE:**
$24.95

**MINIMUM ORDER:**          **UPDATES:**
8,000                                    Monthly

**NET NAME ARRANGEMENTS:**
Net 85%   R/C $8.00/M   Minimum 50,000

**TERMS AND CONDITIONS:**
Orders cancelled post merge or on/after mail date require payment in full. Orders cancelled before mail date will be subject to a $100/F cancellation fee, $15/M Running Charges and applicable selection charges i.e. enhanced selections and applicable shipping/media fees.

For detailed recommendations, please contact:
Mary Ann Montalbano x2204; maryamon@sms-inc.com

For counts, usage and orders, please contact:
Monica  Drakeford x2119; monicadra@sms-inc.com



**SPECIALISTS**
MARKETING SERVICES          777 Terrace Avenue, Suite 401  Hasbrouck Heights  NJ 07604  201-865-5800  www.sms-inc.com

*See* Complaint Ex. C.

5.      ATK, through SMS, also offers access to its "America's Test Kitchen Wiland Direct Modeling Masterfile" at the same base price of "$100/M."[2] The "Wiland Direct Modeling" list allows "Wiland Direct members [to] apply their models to the America's Test Kitchen Masterfile as well as the individual magazine/online and book titles, allowing them to reach their ideal target audience."

**America's Test Kitchen Wiland Direct Modeling Masterfile**

America's TEST KITCHEN

| SEGMENTS: | | | |
|---|---|---|---|
| 1,807,097 | Total Buyers | $30.00/M | $100.00/M |
| | Catalog Rate | | $90.00/M |
| | Fundraisers Rate | | $75.00/M |

PROFILE:
Wiland Direct members can apply their models to the America's Test Kitchen Masterfile as well as the individual magazine/online and book titles, allowing them to reach their ideal target audience. Names will be delivered net of the mailer's house file providing incremental names to be applied in the merge. This is a great way for nonprofit, fundraising and cataloger to tap into these responsive consumers.

America's Test Kitchen is comprised of subscribers and buyers from: Cook's Illustrated Magazine, Cook's Country Magazine, Cook's Illustrated and Cook's Country Book Buyers, and online subscribers to ATK, Cook's Illustrated and Cook's Country Online.

This is a must test for all cooking, kitchenware, home furnishing, gardening, publishing, credit, fundraising and general merchandise offers!

SELECTIONS:
Wiland Scoring Fee                                    $30.00/M

ADDRESSING:
Email                                                    $75.00/F

COUNTS THROUGH:          NEXT UPDATE:
04/30/2019                          06/07/2019

SOURCE:
DMS/Online
100% Direct to Publisher

GENDER:
61% Female
26% Male

DEMOGRAPHICS:
Average Age - 45
Average Income - $75,000
88% College Educated
68% Own their Home

UNIT OF SALE:
$24.00

MINIMUM ORDER:          UPDATES:
10,000                          Monthly

NET NAME ARRANGEMENTS:
Net 85%   R/C $9.00/M   Minimum 50,000

TERMS AND CONDITIONS:
Orders cancelled post merge or on/after mail date require payment in full. Orders cancelled before mail date will be subject to a $100/F cancellation fee. $15/M Running Charges and applicable selection charges i.e. enhanced selections and applicable shipping/media fees.

All exchange orders are based on the gross quantity shipped.

For detailed recommendations, please contact:
Mary Ann Montalbano x2204; maryamon@sms-inc.com

For counts, usage and orders, please contact:
Monica Drakeford x2119; moniodra@sms-inc.com



SPECIALISTS
MARKETING SERVICES          777 Terrace Avenue, Suite 401  Hasbrouck Heights  NJ 07604  201-865-5800  www.sms-inc.com

*See* Complaint Ex. D.

---

[2] Wiland Direct is a data cooperative.  *See* https://wiland.com/about/company-overview.  The Wilad data cooperative pools "first-party, transaction-level consumer spending data" of "250,000,000 adult U.S. consumers."  *Id.*

6.      By renting, exchanging, or otherwise disclosing the Personal

Reading Information of its Michigan-based subscribers between June 13, 2016 and

July 30, 2016, ATK violated the PPPA.  Subsection 2 of the PPPA provides:

> [A] person, or an employee or agent of the person,
> engaged in the business of selling at retail, renting, or
> lending books or other written materials ... shall not
> disclose to any person, other than the customer, a record
> or information concerning the purchase ... of those
> materials by a customer that indicates the identity of the
> customer.

PPPA § 2.

7.      Accordingly, Plaintiff brings this Class Action Complaint against

ATK for its intentional and unlawful disclosure of its customers' Personal Reading

Information in violation of the PPPA, and for unjust enrichment.

## NATURE OF THE CASE

8.      To supplement its revenues, ATK rents, exchanges, or otherwise

discloses its customers' personal information—including their full names, titles of

magazines subscribed to, and home addresses (collectively "Personal Reading

Information"), as well as myriad other personal, lifestyle, and demographic

information such as gender, age, ethnicity, income, religion, parental status, and

political affiliation—to data aggregators, data appenders, data cooperatives, and

other third parties without the written consent of its customers.

9.      By renting, exchanging, or otherwise disclosing – rather than selling

6

– its customers' Personal Reading Information, ATK is able to disclose the information time and time again to countless third parties.

10.    ATK's disclosure of Personal Reading Information, and other personal, demographic, and lifestyle information is not only unlawful, but also dangerous because it allows for the targeting of particularly vulnerable members of society.

11.    While ATK profits handsomely from the unauthorized rental, exchange, and/or disclosure of its customers' Personal Reading Information and other personal information, it does so at the expense of its customers' privacy and statutory rights because ATK does not obtain its customers' written consent prior to disclosing their Personal Reading Information.

## **PARTIES**

12.    Plaintiff Steven Kittle is a natural person and citizen of the State of Michigan.  Plaintiff Kittle was a subscriber to *Cook's Illustrated* magazine, including between June 13, 2016 and July 30, 2016.  *Cook's Illustrated* magazine is published by ATK.  While residing in, a citizen of, and present in Michigan, Plaintiff Kittle purchased his subscription to *Cook's Illustrated* magazine directly from ATK.  Prior to and at the time he subscribed to *Cook's Illustrated*, ATK did not notify Plaintiff Kittle that it discloses the Personal Reading Information of its customers, and Plaintiff Kittle has never authorized ATK to do so.  Furthermore,

Plaintiff Kittle was never provided any written notice that ATK rents, exchanges, or otherwise discloses its customers' Personal Reading Information, or any means of opting out.  Since subscribing to *Cook's Illustrated*, and between June 13, 2016 and July 30, 2016, ATK disclosed, without consent or prior notice, Plaintiff Kittle's Personal Reading Information to data aggregators, data appenders, and/or data cooperatives, who then supplement that information with data from their own files. Moreover, during that same period, ATK rented or exchanged mailing lists containing Plaintiff Kittle's Personal Reading Information to third parties seeking to contact ATK subscribers, without first obtaining Plaintiff Kittle's written consent or even giving him prior notice of the rentals, exchanges, and/or other disclosures.  Because ATK rented, exchanged, and/or otherwise disclosed his Personal Reading Information, Plaintiff Kittle now receives junk mail from charities and other organizations that do not offer products or services to consumers.  These unwarranted mailings waste Plaintiff Kittle's time, money, and resources.  These harassing junk mailings received by Plaintiff Kittle' are attributable to ATK's unauthorized rental, exchange, and/or disclosure of his Personal Reading Information.  Because Plaintiff Kittle is entitled by law to privacy in his Personal Reading Information, and because he paid money for his subscription, ATK's disclosure of his Personal Reading Information deprived Plaintiff Kittle of the full set of benefits to which he was entitled as a part of his

*Cook's Illustrated* subscription, thereby causing economic harm.  Accordingly, what Plaintiff Kittle received (a subscription without statutory privacy protections) was less valuable than what he paid for (a subscription with accompanying statutory privacy protections), and he would not have been willing to pay as much, if at all, for his *Cook's Illustrated* subscription had he known that ATK would disclose his Personal Reading Information.

13.    Defendant America's Test Kitchen LP is a Massachusetts limited partnership with its principal place of business at 17 Station Street, Brookline, MA 02445.  ATK does business throughout Michigan and the entire United States.

## JURISDICTION AND VENUE

14.    This Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendant.  This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

15.    The Court has personal jurisdiction over ATK because Plaintiff's claims arose in substantial part from actions and omissions in Michigan, including from Plaintiff's purchase of a *Cook's Illustrated* subscription in Michigan, ATK's direction of such *Cook's Illustrated* subscription into Michigan, and ATK's failure

9

to obtain Plaintiff's written consent in Michigan prior to disclosing his Personal

Reading Information, including his residential address in Michigan, to another

person, the effects of which were felt from within Michigan by a citizen and

resident of Michigan.  Personal jurisdiction also exists over ATK in Michigan

because ATK conducts substantial business within Michigan, such that ATK has

significant, continuous, and pervasive contacts with the State of Michigan.

16.    Venue is proper in this District pursuant to 28 U.S.C. § 1391

because ATK does substantial business in this District and a substantial part of the

events giving rise to Plaintiff's claims took place within this judicial District.

## FACTUAL BACKGROUND

### *Michigan's Preservation of Personal Privacy Act*

17.    In 1988, members of the United States Senate warned that records of

consumers' purchases and rentals of audiovisual and publication materials offer "a

window into our loves, likes, and dislikes," and that "the trail of information

generated by every transaction that is now recorded and stored in sophisticated

record-keeping systems is a new, more subtle and pervasive form of surveillance."

S. Rep. No. 100-599 at 7–8 (1988) (statements of Sens. Simon and Leahy,

respectively).

18.    Recognizing the need to further protect its citizens' privacy rights,

Michigan's legislature enacted the PPPA "to preserve personal privacy with respect

10

to the purchase, rental, or borrowing of certain materials," by prohibiting companies from disclosing certain types of sensitive consumer information. H.B. No. 5331, 1988 Mich. Legis. Serv. 378 (West).

19.     Subsection 2 of the PPPA states:

> [A] person, or an employee or agent of the person, engaged in the business of selling at retail, renting, or lending books or other written materials . . . *shall not disclose* to any person, other than the customer, a record or information concerning the purchase . . . of those materials by a customer that indicates the identity of the customer.

PPPA § 2 (emphasis added).

20.     Michigan's protection of reading information reflects the "gut feeling that people ought to be able to read books and watch films without the whole world knowing," and recognizes that "[b]ooks and films are the intellectual vitamins that fuel the growth of individual thought. The whole process of intellectual growth is one of privacy—of quiet, and reflection. This intimate process should be protected from the disruptive intrusion of a roving eye." S. Rep. No. 100–599, at 6 (Statement of Rep. McCandless).

21.     As Senator Patrick Leahy recognized in proposing the Video and Library Privacy Protection Act (later codified as the Video Privacy Protection Act, 18 U.S.C. § 2710), "[i]n practical terms our right to privacy protects the choice of movies that we watch with our family in our own homes. And it protects the

selection of books that we choose to read."  134 Cong. Rec. S5399 (May 10, 1988).

22.     Senator Leahy also explained why choices in movies and reading materials are so private:  "These activities are at the core of any definition of personhood.  They reveal our likes and dislikes, our interests and our whims.  They say a great deal about our dreams and ambitions, our fears and our hopes.  They reflect our individuality, and they describe us as people."  *Id.*

23.     Michigan's passage of the PPPA also established as a matter of law "that a person's choice in reading, music, and video entertainment is a private matter, and not a fit subject for consideration by gossipy publications, employers, clubs, or anyone else for that matter."  *Privacy: Sales, Rentals of Videos, etc.*, House Legislative Analysis Section, H.B. No. 5331, Jan. 20, 1989 (attached hereto as **Exhibit A**).

24.     Despite the fact that thousands of Michigan residents subscribe to ATK's publications, ATK disregarded its legal responsibility by systematically violating the PPPA.

### *The Personal Information Market:  Consumers' Personal Information Has Real Value*

25.     In 2001, Federal Trade Commission ("FTC") Commissioner Orson Swindle remarked that "the digital revolution . . . has given an enormous capacity to the acts of collecting and transmitting and flowing of information, unlike anything we've ever seen in our lifetimes . . . [and] individuals are concerned about

being defined by the existing data on themselves."[3]

26.     More than a decade later, Commissioner Swindle's comments ring truer than ever, as consumer data feeds an information marketplace that supports a $26 billion dollar per year online advertising industry in the United States.[4]

27.     The FTC has also recognized that consumer data possesses inherent monetary value within the new information marketplace and publicly stated that:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis—and profit.[5]

28.     In fact, an entire industry exists while companies known as data aggregators purchase, trade, and collect massive databases of information about consumers.  Data aggregators then profit by selling this "extraordinarily intrusive"

---

[3] The Information Marketplace:  Merging and Exchanging Consumer Data  (Mar. 13, 2001), at 8:15-11:16, *available at* https://www.ftc.gov/sites/default/files/documents/public_events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf (last visited Jan. 29, 2019).

[4] *See* Web's Hot New Commodity: Privacy, WSJ.com (Feb. 28, 2011), http://online.wsj.com/article/SB10001424052748703529004576160764037920274.html (last visited Jan. 29, 2019).

[5] Statement of FTC Commissioner Pamela Jones Harbour (Dec. 7, 2009), at 2,  *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf  (last visited Jan. 29, 2019) (emphasis added).

information in an open and largely unregulated market.[6]

29.    The scope of data aggregators' knowledge about consumers is immense:  "If you are an American adult, the odds are that [they] know[] things like your age, race, sex, weight, height, marital status, education level, politics, buying habits, household health worries, vacation dreams—and on and on."[7]

30.    Further, "[a]s use of the Internet has grown, the data broker industry has already evolved to take advantage of the increasingly specific pieces of information about consumers that are now available."[8]

31.    Recognizing the serious threat the data mining industry poses to consumers' privacy, on July 25, 2012, the co-Chairmen of the Congressional Bi-Partisan Privacy Caucus sent a letter to nine major data brokerage companies seeking information on how those companies collect, store, and sell their massive

---

[6] *See* Martha C. White, *Big Data Knows What You're Doing Right Now*, TIME.com (July 31, 2012), http://moneyland.time.com/2012/07/31/big-data-knows-what-youre-doing-right-now/ (last visited Jan. 29, 2019).

[7] Natasha Singer, *You for Sale: Mapping, and Sharing, the Consumer Genome*, N.Y. Times (June 16, 2012), *available at* http://www.nytimes.com/2012/06/17/technology/acxiom-the-quiet-giant-of-consumer-database-marketing.html (last visited Jan. 29, 2019).

[8] Letter from Senator John D. Rockefeller IV, Chairman, Senate Committee on Commerce, Science, and Transportation, to Scott E. Howe, Chief Executive Officer, Acxiom (Oct. 9, 2012) *available at* http://www.commerce.senate.gov/public/?a=Files.Serve&File_id=3bb94703-5ac8-4157-a97b-a658c3c3061c (last visited Jan. 29, 2019).

collections of consumer data.[9]

32.     In their letter, the co-Chairmen recognized that:

> By combining data from numerous offline and online
> sources, data brokers have developed hidden dossiers on
> every U.S. consumer.  This large[-]scale aggregation of
> the personal information of hundreds of millions of
> American citizens raises a number of serious privacy
> concerns.[10]

33.     Data aggregation is especially troublesome when consumer

information is sold to direct-mail advertisers.  In addition to causing waste and

inconvenience, direct-mail advertisers often use consumer information to lure

unsuspecting consumers into various scams,[11] including fraudulent sweepstakes,

charities, and buying clubs.  Thus, when companies like ATK share information

with data aggregators, data cooperatives, and direct-mail advertisers, they

contribute to the "[v]ast databases of names and personal information" that are

often "sold to thieves by large publicly traded companies," which "put[s] almost

---

[9] *See Bipartisan Group of Lawmakers Query Data Brokers About Practices
Involving Consumers' Personal Information*, Website of Senator Ed Markey (July
24, 2012), http://www.markey.senate.gov/news/press-releases/bipartisan-group-
of-lawmakers-query-data-brokers-about-practices-involving-consumers-personal-
information (last visited Jan. 29, 2019).

[10] *Id.*

[11] *See Prize Scams*, Federal Trade Commission,
http://www.consumer.ftc.gov/articles/0199-prize-scams (last visited Jan. 29, 2019).

anyone within the reach of fraudulent telemarketers" and other criminals.[12]

34.     Information disclosures like ATK's are particularly dangerous to the elderly.  "Older Americans are perfect telemarketing customers, analysts say, because they are often at home, rely on delivery services, and are lonely for the companionship that telephone callers provide."[13]  The FTC notes that "[t]he elderly often are the deliberate targets of fraudulent telemarketers who take advantage of the fact that many older people have cash reserves or other assets to spend on seemingly attractive offers."[14]

35.     Indeed, an entire black market exists while the personal information of vulnerable elderly Americans is exchanged.  Thus, information disclosures like ATK's are particularly troublesome because of their cascading nature:  "Once marked as receptive to [a specific] type of spam, a consumer is often bombarded

---

[12] Charles Duhigg, *Bilking the Elderly, With a Corporate Assist*, N.Y. Times,  May 20, 2007, *available at* http://www.nytimes.com/2007/05/20/business/20tele.html?pagewanted=all&_r=0 (last visited Jan. 29, 2019).

[13] *Id.*

[14] *Fraud Against Seniors:  Hearing before the Senate Special Committee on Aging* (August 10, 2000) (prepared statement of the FTC), *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/prepared-statement-federal-trade-commission-fraud-against-seniors/agingtestimony.pdf (last visited Jan. 29, 2019).

with similar fraudulent offers from a host of scam artists."[15]

36.     ATK is not alone in jeopardizing its subscribers' privacy and well-being in exchange for increased revenue:  disclosing subscriber information to data aggregators, data appenders, data cooperatives, direct marketers, and other third parties is a widespread practice in the publishing industry.

37.     Thus, as consumer data has become an ever-more valuable commodity, the data mining industry has experienced rapid and massive growth. Unfortunately for consumers, this growth has come at the expense of their most basic privacy rights.

### Consumers Place Monetary Value on their Privacy and Consider Privacy Practices When Making Purchases

38.     As the data aggregation and cooperative industry has grown, so too have consumer concerns regarding the privacy of their personal information.

39.     A recent survey conducted by Harris Interactive on behalf of TRUSTe, Inc. showed that 89 percent of consumers polled avoid doing business with companies who they believe do not protect their privacy online.[16]  As a result,

---

[15] *See id.*

[16] *See 2014 TRUSTe US Consumer Confidence Privacy Report*, TRUSTe, http://www.theagitator.net/wp-content/uploads/012714_ConsumerConfidenceReport_US1.pdf (last visited Jan. 29, 2019).

81 percent of smartphone users polled said that they avoid using smartphone apps that they don't believe protect their privacy online.[17]

40.     Thus, as consumer privacy concerns grow, consumers are increasingly incorporating privacy concerns and values into their purchasing decisions and companies viewed as having weaker privacy protections are forced to offer greater value elsewhere (through better quality and/or lower prices) than their privacy- protective competitors.

41.     In fact, consumers' personal information has become such a valuable commodity that companies are beginning to offer individuals the opportunity to sell their personal information themselves.[18]

42.     These companies' business models capitalize on a fundamental tenet underlying the personal information marketplace: consumers recognize the economic value of their private data. Research shows that consumers are willing to pay a premium to purchase services from companies that adhere to more stringent policies of protecting their personal data.[19]

---

[17] *Id.*

[18] *See* Joshua Brustein, *Start-Ups Seek to Help Users Put a Price on Their Personal Data*, N.Y. Times (Feb. 12, 2012), *available at* http://www.nytimes.com/2012/02/13/technology/start-ups-aim-to-help-users-put-a-price-on-their-personal-data.html (last visited Jan. 29, 2019).

[19] *See* Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22(2) Information Systems Research 254,

43.      Thus, in today's economy, individuals and businesses alike place a real, quantifiable value on consumer data and corresponding privacy rights.[20]  As such, while a business offers customers a service that includes statutorily guaranteed privacy protections, yet fails to honor these guarantees, the customer receives a service of less value than the service paid for.

### *ATK Unlawfully Rents, Exchanges, And Discloses Its Customers' Personal Reading Information*

44.      ATK maintains a vast digital database comprised of its customers' Personal Reading Information.  ATK discloses its customers' Personal Reading Information to data aggregators and appenders who then supplement that information with additional sensitive personal information about each ATK customer, including gender, purchasing habits and charitable.  (*See, e.g.*, **Exhibits B-C**).

45.      ATK then rents and/or exchanges its mailing lists—which include subscribers' Personal Reading Information identifying which individuals

---

254 (2011); *see also* European Network and Information Security Agency, *Study on monetising privacy* (Feb. 27, 2012), *available at* https://www.enisa.europa.eu/activities/identity-and-trust/library/deliverables/monetising-privacy (last visited Jan. 29, 2019).

[20] *See* Hann, *et al.*, *The Value of Online Information Privacy: An Empirical Investigation* (Oct. 2003) at 2, *available at* http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.321.6125&rep=rep1&type=pdf (last visited Aug. 30, 2018) ("The real policy issue is not whether consumers value online privacy. It is obvious that people value online privacy.")

purchased which magazines, and can include the sensitive information obtained from data aggregators and appenders—to other data aggregators and appenders, other consumer-facing businesses, non-profit organizations seeking to raise awareness and solicit donations, and to political organizations soliciting donations, votes, and volunteer efforts. (*See* **Exhibits B–C**).

46. ATK also discloses its customers' Personal Reading Information to data cooperatives, who in turn, give ATK access to their own mailing list databases.

47. As a result of ATK's data compiling and sharing practices, companies can purchase and/or obtain mailing lists from ATK that identify ATK customers by their most intimate details: income, political affiliation, religious practice, and charitable donations. ATK's disclosure of such sensitive and personal information puts consumers, especially the more vulnerable members of society, at risk of serious harm from scammers.

48. ATK does not seek its customers' prior written consent to any of these disclosures and its customers remain unaware that their Personal Reading Information and other sensitive personal information is being rented and exchanged on the open market.

49. Consumers can sign up for ATK subscriptions through numerous media outlets, including the Internet, telephone, or traditional mail. Regardless of

how the consumer subscribes, ATK never requires the individual to read or agree
to any terms of service, privacy policy, or information-sharing policy.
Consequently, ATK uniformly fails to obtain any form of consent from – or even
provide effective notice to – its customers before disclosing their Personal Reading
Information.

50.     As a result, ATK disclosed its customers' Personal Reading
Information – including their reading habits and preferences that can "reveal
intimate facts about our lives, from our political and religious beliefs to our health
concerns"[21] – to anybody willing to pay for it.

51.     By and through these actions, ATK has intentionally disclosed to
third parties its Michigan customers' Personal Reading Information without
consent, in direct violation of the PPPA.

## CLASS ACTION ALLEGATIONS

52.     Plaintiff seeks to represent a class defined as all Michigan residents
who, at any point in time between June 13, 2016 and July 30, 2016, had their
Personal Reading Information disclosed to third parties by ATK without consent
(the "Class").  Excluded from the Class is any entity in which Defendant has a
controlling interest, and officers or directors of Defendant.

---

[21] *California's Reader Privacy Act Signed into Law*, Electronic Frontier
Foundation (Oct. 3,
2011), https://www.eff.org/press/archives/2011/10/03 (last visited Jan. 29, 2019).

53.     Members of the Class are so numerous that their individual joinder herein is impracticable.  On information and belief, members of the Class number in the thousands.  The precise number of Class members and their identities are unknown to Plaintiff at this time but may be determined through discovery.  Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant.

54.     Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:  (a) whether ATK is a "retailer or distributor" of publications (*i.e.*, magazines); (b) whether ATK obtained consent before disclosing to third parties Plaintiff's and the Class's Personal Reading Information; (c) whether ATK's disclosure of Plaintiff's and the Class's Personal Reading Information violated the PPPA; and (d) whether ATK's rental, exchange, and/or disclosure of Plaintiff's and the Class's Personal reading Information constitutes unjust enrichment.

55.     The claims of the named Plaintiff are typical of the claims of the Class in that the named Plaintiff and the Class sustained damages as a result of Defendant's uniform wrongful conduct, based upon Defendant's disclosure of Plaintiff's and the Class's Personal Reading Information.

56.     Plaintiff is an adequate representative of the Class because his

22

interests do not conflict with the interests of the Class members he seeks to represent, he has retained competent counsel experienced in prosecuting class actions, and he intends to prosecute this action vigorously.  The interests of Class members will be fairly and adequately protected by Plaintiff and his counsel.

57.    The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class members.  Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## COUNT I
### Violation of the Preservation of Personal Privacy Act
### (PPPA § 2)

58.    Plaintiff repeats the allegations contained in the foregoing paragraphs

23

as if fully set forth herein.

59.     Plaintiff brings this claim individually and on behalf of members of the Class against Defendant ATK.

60.     As a magazine publisher that sells subscriptions to consumers, ATK is engaged in the business of selling written materials at retail.  *See* PPPA § 2.

61.     By purchasing a subscription to *Cook's Illustrated* magazine, Plaintiff purchased written materials directly from ATK.  *See* PPPA § 2.

62.     Because Plaintiff purchased written materials directly from ATK, he is a "customer" within the meaning of the PPPA.  *See* PPPA § 1.

63.     At various times between June 13, 2016 and July 30, 2016, ATK disclosed Plaintiff's Personal Reading Information, which identified him as a *Cook's Illustrated* customer, in at least three ways.

64.     First, ATK disclosed mailing lists containing Plaintiff's Personal Reading Information to data aggregators and data appenders, who then supplemented the mailing lists with additional sensitive information from their own databases, before sending the mailing lists back to ATK.

65.     Second, ATK disclosed mailing lists containing Plaintiff's Personal Reading Information to data cooperatives, who in turn gave ATK access to their own mailing list databases.

66.     Third, ATK rented and/or exchanged its mailing lists containing

24

Plaintiff's Personal Reading Information—enhanced with additional information

from data aggregators and appenders—to third parties, including other consumer-

facing companies, direct-mail advertisers, and organizations soliciting monetary

contributions, volunteer work, and votes.

67.     Because the mailing lists included the additional information from the

data aggregators and appenders, the lists were more valuable, and ATK was able to

increase its profits gained from the mailing list rentals and/or exchanges.

68.     By renting, exchanging, or otherwise disclosing its customer lists,

between June 13, 2016 and July 30, 2016, ATK disclosed to persons other than

Plaintiff records or information concerning his purchase of written materials from

ATK.  *See* PPPA § 2.

69.     The information ATK disclosed indicates Plaintiff's name and

address, as well as the fact that he subscribed to *Cook's Illustrated*.  Accordingly,

the records or information disclosed by ATK indicate Plaintiff's identity.  *See*

PPPA § 2.

70.     Plaintiff and the members of the Class never consented to ATK

disclosing their Personal Reading Information to anyone.

71.     Worse yet, Plaintiff and the members of the Class did not receive

notice before ATK disclosed their Personal Reading Information to third parties.

72.     On information and belief, ATK's disclosures, between June 13, 2016

25

and July 30, 2016, of Plaintiff's and the Class's Personal Reading Information were not made pursuant to a court order, search warrant, or grand jury subpoena.

73.     ATK's disclosures, between June 13, 2016 and July 30, 2016, of Plaintiff's and the Class's Personal Reading Information were not made to collect payment for their subscriptions.

74.     ATK's disclosures, between June 13, 2016 and July 30, 2016, of Plaintiff's Personal Reading Information were made to data aggregators, data appenders, data cooperatives, direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes—all in order to increase ATK's revenue.  Accordingly, ATK's disclosures were not made for the exclusive purpose of marketing goods and services directly to Plaintiff and the members of the Class.

75.     By disclosing Plaintiff's Personal Reading Information, between June 13, 2016 and July 30, 2016, ATK violated Plaintiff's and the Class's statutorily-protected right to privacy in their reading habits.  *See* PPPA § 2.

76.     Additionally, because Plaintiff and the members of the Class paid for their subscriptions to ATK's publications, and ATK was obligated to comply with the PPPA, ATK's unlawful disclosure of Plaintiff's and the other Class members' Personal Reading Information deprived Plaintiff and the Class members of the full value of their paid-for subscriptions.  Because Plaintiff and the other Class members ascribe monetary value to the privacy of their Personal Reading

26

Information, ATK's unlawful rental, exchange, and/or other disclosure of their Personal Reading Information caused them to receive less value than they paid for, thereby causing them economic harm.

77.     Likewise, because Plaintiff and the other Class members ascribe monetary value to the privacy of their Personal Reading Information, a magazine publication subscription that keeps their Personal Reading Information private is more valuable than one that does not.

78.     Accordingly, had Plaintiff been adequately informed of ATK's disclosure practices, he would not have been willing to purchase his *Cook's Illustrated* subscription at the price charged, if at all.  Thus, ATK's unlawful disclosures caused Plaintiff economic harm.

79.     ATK's disclosure of Plaintiff's Personal Reading Information to third parties has also caused an influx of third party print advertisements.

80.     As a result of ATK's unlawful disclosure of their Personal Reading Information, Plaintiff and the members of the Class have suffered privacy and economic injuries.  On behalf of himself and the Class, Plaintiff seeks:  (1) an injunction requiring Defendant ATK to obtain consent from Michigan customers prior to the disclosure of their Personal Reading Information as required by the PPPA; (2) actual damages, including disgorgement, or $5,000.00, whichever is greater, per Class member pursuant to PPPA § 5(a); and (3) costs and reasonable

27

attorneys' fees pursuant to PPPA § 5(b).

## COUNT II
## Unjust Enrichment

81.     Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein.

82.     Plaintiff brings this claim individually and on behalf of the members of the Class against Defendant ATK.

83.     Plaintiff and the Class members conferred benefits on ATK by providing ATK with their Personal Reading Information and paying ATK for their magazine publication subscriptions.

84.     ATK received and retained the information and money belonging to Plaintiff and the Class when Plaintiff and the Class subscribed to ATK's publications.

85.     Because ATK received and processed Plaintiff's and the Class's subscription payments and Personal Reading Information, and because ATK has employees and/or agents handling customer accounts and billing as well as customer data, ATK appreciates or has knowledge of such benefits.

86.     Under the PPPA, Plaintiff and the Class members were entitled to confidentiality in their Personal Reading Information as part of their subscriptions.

87.     Under principles of equity and good conscience, because ATK failed to comply with the PPPA, ATK should not be allowed to retain the full amount of

money Plaintiff and the Class paid for their subscriptions or the money it received by renting, exchanging, and/or otherwise disclosing Plaintiff's and the Class's Personal Reading Information.

88.     Moreover, ATK should not be allowed to retain the monies it received as a result of renting, exchanging, and/or otherwise disclosing Plaintiff's and the Class's Personal Reading Information.

89.     Plaintiff and the other Class members have suffered actual damages as a result of ATK's unlawful conduct in the form of the value Plaintiff and the other Class members paid for and ascribed to the confidentiality of their Personal Reading Information.  This amount is tangible and will be calculated at trial.

90.     Additionally, Plaintiff and the Class members have suffered actual damages inasmuch as ATK's failure to inform them that it would disclose their Personal Reading Information caused them to purchase magazine publication subscriptions when they otherwise would not have.

91.     Further, a portion of the purchase price of each *Cook's Illustrated* magazine subscription sold to Plaintiff and the other Class members was intended to ensure the confidentiality of Plaintiff's and the other Class members' Personal Reading Information, as required by the PPPA.  Because Plaintiff and the other Class members were denied services that they paid for and were entitled to receive—i.e., confidentiality of their Personal Reading Information—and because

29

Plaintiff and the Class would have commanded a discount to voluntarily forego those benefits, they incurred actual monetary damages.

92.    To prevent inequity, ATK should return to Plaintiff and the Class the value they ascribe to confidentiality of their Personal Reading Information and all money derived from ATK's rental, exchange, and/or other disclosure of Plaintiff's and the Class's Personal Reading Information.

93.    Accordingly, Plaintiff and the Class members seek an order declaring that ATK's conduct constitutes unjust enrichment, and awarding Plaintiff and the Class restitution in an amount to be calculated at trial equal to the amount of money obtained by ATK through its rental, exchange, and/or other disclosure of Plaintiff's and the Class's Personal Reading Information.

## PRAYER FOR RELIEF

94.    WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks a judgment against Defendant as follows:

A.    For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class;

B.    For an order declaring that Defendant's conduct as described herein violates the Preservation of Personal Privacy Act, PPPA;

C.    For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

D.   For an award of actual damages or $5,000, whichever is
     greater, to Plaintiff and each Class member, as provided
     by the Preservation of Personal Privacy Act, PPPA § 5(a);

E.   For prejudgment interest on all amounts awarded;

F.   For an order of restitution and all other forms of equitable
     monetary relief;

G.   For injunctive relief as pleaded or as the Court may deem
     proper; and

H.   For an order awarding Plaintiff and the Class their
     reasonable attorneys' fees and expenses and costs of suit.

## JURY DEMAND

Plaintiff demands a trial by jury on all causes of action and issues so triable.

Dated:  June 13, 2019                     Respectfully submitted,

                                          **STEVEN KITTLE**,

                                          By:_____ */s Philip L. Fraietta*_____
                                          One of Plaintiff's Attorneys

                                          Joseph I. Marchese
                                          jmarchese@bursor.com
                                          Philip L. Fraietta
                                          pfraietta@bursor.com
                                          BURSOR & FISHER, P.A.
                                          888 Seventh Avenue
                                          New York, New York 10019
                                          Tel: 646.837.7150
                                          Fax: 212.989.9163

                                          Frank S. Hedin*
                                          fhedin@hedinhall.com
                                          David W. Hall*

31

dhall@hedinhall.com
HEDIN HALL LLP
1395 Brickell Avenue, Suite 900
Miami, Florida 33131
Tel: 305.357.2107
Fax: 305.200.8801

*Application for Admission Forthcoming
Nick Suciu III
nicksuciu@bmslawyers.com
BARBAT, MANSOUR & SUCIU PLLC
1644 Bracken Road
Bloomfield Hills, Michigan 48302
Tel: 313.303.3472

*Counsel for Plaintiff Steven Kittle*